Your argument next in Case 14-1513, Halo Electronics v. Pulse Electronics and Consolidated Case 14-1520, Stryker Corporation v. Zimmer. Mr. Wall? Mr. Chief Justice, and may it please the Court, the Federal Circuit has developed such a rigid test for enhanced damages in patent infringement cases that a large amount of money is spent on it. The Federal Circuit has done that by moving away from historical practice in two key ways. First, it's made the test all about recklessness rather than also intent. Second, it judges recklessness based on legal defenses developed in litigation rather than the facts at the time of the infringement. The net result, now that this Court in Octane v. Highmark set aside a similarly framework that does not track the enhancement statute's text, history, or purposes. It was not always this way. For nearly 150 years, district courts conducted a totality inquiry subject to deferential review, and as part of that they said the nature of the infringement has to be more than negligent if it's going to be an aggravating factor that counsels in favor of an enhancement. That regime ---- Ginsburg. Is that what you're advocating, to return to that, just it's a matter of discretion for the district court and that's it? In a word, yes. We do think that there are principles to guide district court's discretion, because historically district courts said certain things, but the one agreed-upon principle, and I think we all agree on it, or at least Petitioners and the PTO do, is the court said in the totality, if the patentee wants to point to the nature of the infringement and say that pulls you out of the mine run of cases and that warrants an enhancement, it had to be more than negligent. It had to be intentional or reckless infringement, but based on the facts of the time, it was a traditional willfulness inquiry. It was not the willfulness inquiry that the Federal Circuit conducts, which looks at after-the-fact offenses and not what were the facts facing the infringer at the time of its misdemeanor. Alito, you referred to the nature of the infringement. Is that the only thing that's involved here, or any of the Petitioners asking for enhanced damages based on litigation misconduct, for example? Well, I think there was some litigation misconduct here, and we cite it, and it's in the district court's opinion, that Zimmer did conceal some things in the run-up to trial. So I do think there were some other factors, but I think the major one here, for instance, in Stryker, was the nature of the infringement, that they hired an independent contractor, they handed the contractor a patented product, they said essentially make one of these for us. So we have to decide whether enhanced damages can be awarded solely based on litigation misconduct. That would seem to be a separate question, or you say that the main thing involved is the nature of the infringement. So what is the issue before us? Yeah. I don't want to say that you have to, and I want to be careful about litigation misconduct, because in a number of the older cases, it was something like concealment, which was post-infringement, but pre-litigation. So it was a broader category of misconduct. But, no, I think the only reason that we and the PTO have pointed to the compensation cases and the misconduct cases is just to show that for 150 years, it was a totality inquiry, and district courts were looking at a lot of different things. These cases are primarily about the nature of the infringement. Most cases will be like that. I think if the Court wanted to provide guidance to the Federal Circuit about how to run this statute, it should say go back to doing a totality inquiry, and here are some of the principles that historically guided your exercise of discretion. But I don't think you have to do that, Justice Alito. I think you could do it ordinarily. Roberts, why is the nature of the infringement so determinative under your view? Yes, they copied it, but perhaps they had, you know, a good-faith belief that this wasn't patented. So the fact that they copied it doesn't seem to me to automatically make it something which is suitable for sanctions. So the products here were marked. I mean, they were marked as patented. But I take your point, Mr. Chief Justice, and I think Or they could have had, you know, a good-faith belief that the patent wasn't valid. Sure. And that's exactly historically how the case is played out, and it's how they should play out once this Court takes care of Seagate, which is both parties come in at the enhancement stage. Most of the evidence has come in on infringement or liability or damages. And the patentee will say you copied a patented product and haven't shown any evidence that you had a reasonable belief in invalidity. And the defendant, if the patentee has carried its burden, will say, no, I did some investigation. I thought it wasn't infringing. I thought it was invalid. And the district court will make a judgment call faced with those competing narratives about what the right answer is based on the facts. Our point is that that judgment call that district courts are making for a very long time has essentially been stripped from them because it no longer matters, even if you acted intentionally at the time, as Zimmer did. What the Federal Circuit says is, if you can hire good lawyers and come up with defenses in litigation, you'll be off the hook. And as Justice Breyer pointed out in the Octane litigation, and I now know it's true from preparing for this case, you can — a patent lawyer can virtually always come up with some non-frivolous defense in litigation, and that's why, in effect, what you have is almost a per se bar. Breyer, that may be, but this is my question on this. The statute doesn't say anything. The statute just says, in either event, the court may increase the damages up to three times the amount found or assessed. I don't get too much guidance from that. Let me assume against you, assume against you, that the history does not favor you. The history insists upon willful. Let me assume with you that there isn't good ground for clearing convincing. Nothing suggests that. But now the hardest part for me, and it is hard, I don't have a clear answer, is there are indeed some preliminary intests. If, for example, the patentee has a flaw in his patent, not enough to kill it, but enough to make it pretty uncertain, a weak patent, there are all kinds of things wrong with it, no willfulness damages, irrespective almost of the state of mind of the infringer. So what could be said for that? You've read their excellent briefs on both sides, and you know perfectly well what can be said for that. And if I summarize it, and that's what I want your answer to, today's patent world is not a steam engine world. We have decided to patent tens of thousands of software products and similar things, where hardly anyone knows what the patent's really about. A company that's a start-up, a small company, once it gets a letter, cannot afford to pay $10,000 to $100,000 for a letter from counsel and may be willing to run its chances. You start saying, little company, you must pay $10,000 to $100,000 to get a letter, lest you get willful damages against you should your bet be wrong. We have one more path leading us to national monopoly by Google and Yahoo or their monopolies throughout the United States. It's designed to help the small businessman not to hurt him. So leave those words for interpretation to the expert court, and in this area it may well be the Federal Circuit. Have I stated the argument pretty much the way it is, or if I have, I would like your response to it. I think you have stated the best possible version of Respondent's argument. I'm happy with your assumptions. The PTO embraces them, and we are not living in a steam engine world. It's a high bar to carry, and I don't think patentees are often going to be able to do it. And what you rightly said, I think that is what Respondent's have been their strategy in this Court. Breyer's not just their strategy, we have all kinds of amicus briefs that say that's the truth. And indeed, thousands and thousands and thousands of small businessmen are trying to break into businesses that they just can't do without software, and when you have hundreds of thousands of patents on software by other companies, that means we can't break in. Justice Breyer, the sky didn't fall for a century and a half, and it's not going to fall if you reverse the Federal Circuit's framework, just as it didn't fall after Octane and Highmark in the fees context. You've got to show as a patentee you've got to show the market shares of the different companies that are seriously involved in software. Justice Breyer, showing intent or recklessness based on the facts of the time is not going to be easy. The intent box is copying patented products, and I don't think we have a lot of dispute that where people are copying patented products in the absence of a reasonable belief in invalidity, it doesn't matter whether they're making software or software or carriageway. Breyer's just used a word that might help, reasonable belief. We say that where a company is small, where it is small, and wants to run the risk, follow the Fed Circuit rule. In order to show willfulness, because it's reasonable, in order to show willfulness, you have to show that that infringer not only didn't know it was flawed, faulty, but also was a big company that was pretty used to getting these lawyers' opinions and also pretty used to asking their own experts whether it really was a good patent or not, and they didn't do it here. What about something like that? We tried in our opening brief to embrace the full totality of circumstances, including the strength of the patent, the kind of notice, what's commercially reasonable in the industry. The one point I just want to make, because I think it's very important, is to get into the recklessness box at common law and traditionally, you had to show an objectively high risk. So as a patentee, you've got to show to the judge not just that infringement occurred, but that a reasonable person looking at it would have said, there is a very high risk that what I am doing is unlawful because it trenches on someone else's valid patent. That's a pretty high bar. You're not going to be able to satisfy that. You shouldn't be able to satisfy that in a lot of cases. I think the strength of the PTO's argument is when you can show that, the district court should be able to make a judgment call about enhancement, and the fact that it can't shows you that you've really skewed the incentives, because on the other side of the parade of horribles you're worried about are the people who can infringe, knowing that they can discount by the probability that they'll be found to have infringed in litigation, with virtually no back-end penalty, even if they were a very bad infringer, as Zimmer was here. Sotomayor, and I ask because the SG is talking about describing it as egregious conduct. You're saying something about willfulness and recklessness. I don't know if this is all a matter of semantics. But I think the SG is right. Even if you give discretion to the district courts to make a judgment of when to enhance penalties, we have to give them some guidance. It can't be that they can give enhanced penalties on whim. All right? So if it's not whim, what is it? Sotomayor, how do we articulate a test that protects what Justice Breyer is concerned about, which I think is a legitimate concern, but doesn't entrench a position that just favors you? And by that I mean, you know, I think there's a little bit of daylight between us and the government in the sense that we think this statute was invoked for various purposes and not just to punish infringement. But to the extent that you invoke the statute to punish infringement, I think there is no daylight between our position and the government's. So how do you help me write the opinion? I think what the opinion would say, if the guidance is, in the lion's share of cases, what the parties are really debating is the nature of the infringement. That needs to be intentional or reckless based on the facts as they were known to the infringer, and as part of whether the infringer is actually ‑‑ Well, but that, you know, the retest understands life a little ‑‑ Sure. It's more complex than that. Okay? Because you can often use the conduct of someone after the time to reflect what they thought. And so if you're seeing that someone is withholding information, you might be able to infer that there wasn't good faith at the beginning. Sure. So your articulation doesn't really give life to the complexity of this inquiry. So and to add then a little more, I think what you ought to be taking into account is, for instance, the strength of the notice. Some of these letters are just form letters. They really are nothing more than a license. This is all the Reed Corporation factors that the district court here did in the Stryker case. I think that's right. I think some of them will matter more than others. But some claim letters are very fulsome. They have a clean charge. That's very nice, but I don't want to adopt that test. How do I articulate this in a more generalized way? I think what you would say is that in judging whether a reasonable person would have thought that there was a really high risk, you've got to take account of both the strength of the notice, what kind of notice were they on of the patent, and what would have been commercially reasonable in the industry as it exists. And I think that those factors and those limitations are going to take account of the vast bulk of what Justice Breyer and what Respondents are concerned about. Alito, are courts going to be able to assess the state of mind of the infringer at the time of the infringer's conduct without getting into communications with the company's attorneys? Yes, Justice Alito, and they did historically. And I mean, I would point the Court to a case like Consolidated Rubber in Judge Lernan-Hann's opinion. He said, look, you know, the patent was open to doubt for a period of time, and so no enhancement. But at some point, here the facts changed and the infringer knew about them, it reasonably should have known the patent was valid, we start the enhancement running, and then we get some misconduct on the back end like we had in this case, and so he says, I'm rolling it all in, this was more than negligent, and here's the enhancement I'm going to give. Alito, so you have the case where at the time when the question of enhanced damages is decided, the judge can see that the defense was able to, with the help of good lawyers, was able to put on an objectively reasonable, although unsuccessful, defense. How are you going to be able to show that the infringer did not have that same information at the time of the conduct in question? Well, I think in the typical the intent cases are fairly easy because they're generally copying. I think in the typical recklessness case, the infringer will come in and say, here's the fulsome claim letter I sent you, it's actually got a claim chart, it maps on the infringement to the patent, I reached out to you, you never responded, and you continue to infringe. And I think at that point then the defendant has got to say, okay, I did something, but it doesn't have to be talking to a lawyer. I talked to my engineers, I looked at the specifications in the patent, you're limited to devices with four wheels, and I have three. I think there are lots of things that are commercially reasonable depending on the circumstances, and I honestly do think, if you go back and look through the cases historically, that's what good judges and courts were doing for a very long time before the Federal Circuit essentially stripped discretion from them, and having taken the bar too low on underwater devices, overcompensated in Seagate. We think the bar ought to be high, we just don't think it ought to be arbitrarily high as it is now. I'd like to reserve the remaining time. Roberts. Thank you, counsel. Mr. Martinez. Mr. Chief Justice, and may it please the Court, we agree with the Federal Circuit and with all the parties to this case that mere negligence is not enough to trigger enhanced damages. But the Federal Circuit is wrong to categorically bar such damages whenever an infringer presents an objectively reasonable defense at trial. That rule creates an arbitrary loophole that allows some of the most egregious infringers to escape enhanced damages. We should close that loophole. Kennedy. The enhanced damages that we're discussing are really almost entirely punitive if the octane standard for attorneys' fees remains in effect. In other words, the octane standard is — gives a judge much more latitude to put a penalty imposed to award attorneys' fees when there's been unnecessary resistance. So all we're talking about is punitive damages. And you want to basically dismantle the willfulness structure that the court of appeals has established. Is that correct? No. I think that's not correct. I think the Federal Circuit, in our view, took the law in a good direction or a better direction when it reversed its underwater devices standard, which it said was akin to negligence, and it tried to tighten the law versus — about willfulness up to make it harder to get enhanced damages. We think that was a step in the right direction, but we think that they made two important mistakes when they did that. The first one is essentially that they said that in a case where you have subjective intent, that in and of itself is not enough to establish a case for enhanced damages. Essentially, you have to prove recklessness under an objective standard in each and every case. We don't think that's consistent with the history of the statute, with the purpose of the statute, with the way that punitive damages have always been considered, with the way willfulness has always been interpreted. So we think that's wrong. The second mistake we think that the Federal Circuit made is with respect to how the recklessness inquiry is supposed to happen. So recklessness, everyone agrees, is an objective inquiry. And in every other area of law where courts are conducting an objective inquiry, what you're supposed to do is you're supposed to take a reasonable man and you put him in the actual person who is accused of wrongdoing, in his shoes, and you take what that actual person knew, and you figure out whether a reasonable man in that person's shoes would have thought that there was a very high risk that the conduct at issue was unlawful. And what the Federal Circuit does is not that. What they are essentially doing is taking the reasonable man and giving him the benefit of omniscience, giving him the benefit of hindsight, and saying what facts do we know at the time of trial? And now that we know these facts at the time of trial, should we retroactively sort of undo the time of trial? Breyer. Breyer. I didn't think they were doing that. I thought what they were doing was saying we are not going to allow punitive damages in a case where the patent is so weak. And so we're really not looking at the state of mind. And the reason that we're doing that is the reason I said previously. And the reason that we're not leaving it up to 475 trial judges is because those 475 trial judges don't see patent cases very much. And where they have a pretty good idea of how employment law, tort law, and all kinds of other law works, they don't have that a good idea in respect to patent law. And we, the Federal Circuit, do. That's why we are created. And we are afraid that if we do not use this objective standard, what we will see is a major effect discouraging invention because of fear that if we try to invent, we'll get one of these letters and we can't afford $100,000 for an opinion. Now, I've just repeated the same argument. But we did create the government, that expert court, to make such determinations in the face of language that seems to allow it. And so what is wrong with their doing what they were paid to do? I think there are a couple of things that are wrong with that. Because I think the first thing that they're paid to do is to look to the text and history of the statute. And the text is, as you said, doesn't provide a categorical bar. It's silent, so it doesn't provide the kind of categorical bar that the Federal Circuit is asking for. And the history of the statute affirmatively undermines that categorical bar, because the history makes clear that subjective bad intent, the wanton and malicious pirate that this Court talked about in the Seymour case, that is a sufficient basis to enhance damages. With respect to the recklessness standard, the fact that recklessness is objective, we all agree with that. But there's no reason to conduct the objective analysis in a different way in this context from the way that it's conducted in every other context. And imagine a police search. A police search. Breyer. But I just gave you the reason. Now you can say that you don't agree with that reason and give me a reason why it's wrong, but just to say it's no reason is disturbing. Well, I think that the reason you gave is that I think a concern that we share, which is that we think it's important in cases where a patent is of questionable validity, we think it's important to encourage people in certain cases to challenge the patent or to make sure that innovation is not being stifled. And we think that the ordinary standard test for recklessness in our test accommodates that concern because it would treat a reasonable good faith belief that a patent is invalid or that infringement is not occurring as a reason to conclude that enhanced damages are off the table. So it's not a reason to challenge the patent. Roberts. As I read your brief and the Petitioner's brief, I got the sense that there was quite a bit of difference between the two. The government seems to be taking a much higher standard before these punitive damages or however you want to describe them would be allowed. You use terms like egregious a lot. Your friend uses terms like, you know, intentional, more than mere negligence. Is that perception, do you think that perception is an accurate one? I think there's some minor differences. Let me explain how I see our standard and maybe what the differences are. We think our standard covers three different buckets of cases. The first bucket, and this is borne out by the history, the first bucket are cases in which there's intentional conduct or bad faith conduct under a subjective standard, a subjective analysis. That's bucket number one. Roberts. Roberts. Just for one brief moment, by intentional you mean intentional infringement, not intentional. No. Intentional conduct by a person who believes that he is infringing a valid patent. In other words, if you have a good faith belief that the patent is not valid and that belief is reasonable, we don't think you're an intentional infringer. The second bucket covers recklessness cases, and we all agree that recklessness is judged by an objective standard, where we disagree with the other side, is we think it's judged based on the facts and the circumstances that are known to the actual infringer at the time of infringement. And then the third bucket that we think would qualify for enhanced damages are cases involving other types of egregious misconduct not having to do with the infringement itself. For example, if there's corporate espionage, if one of the parties destroyed evidence. I think the difference between us and Petitioners is very minor. I think they would also allow enhanced damages for certain purely compensatory purposes, even when a case did not fall into the other three buckets. We can have an interesting historical discussion about whether or not that basis for damages is warranted or not. I don't think the Court needs to resolve that in this case because it's not presented. But we do think our test is limited to those three buckets, essentially intentional conduct, reckless conduct, and other types of egregious litigation misconduct. We think that that test is a Sotomayor, that avoids the use of the word willful. Right. And I think we think there is a sort of semantic element to this case. I think if you wanted to use that, those three buckets to encompass willfulness, I think we wouldn't stand in the way of that. I think the problem that we see with what the Respondents are trying to do is that they're looking to the history, the pre-1952 cases, and they're taking the word willful out of that. They're plucking that word out, and then they're defining it in a way that's at odds with the way in which willfulness or the way in which the standard was applied before 1952. We think if history is the justification for imposing a willfulness requirement in the first place, history has to provide the guide for interpreting what willfulness means or what the standard is. And I think that one of the ironies of the Respondents' position is that they agree that this statute is, Section 284, is trying to get at culpable infringers. The touchstone is culpability. And they agree that recklessness is culpable enough to get you into enhanced damages world. And yet, everyone agrees, everyone in the civil law and the criminal law, intentional misconduct has always been considered worse than reckless conduct, and yet their test would allow a class of intentional infringers to essentially get out of jail for free based on their ability to hire a lawyer and come up with a post hoc defense and present that defense itself. Sotomayor, why isn't that post hoc defense necessarily, you're almost reading it as unreasonable, by definition? I think it's possible to imagine, let me make it concrete, imagine a case in which there's intentional violation or a reckless violation based on the facts known at the time, and later the person is sued, the infringer is sued, and he hires a law firm that scours the world, and they find the library in Germany that has a Ph.D. dissertation that has some patents that arguably anticipated the invention at issue. So that's a new fact. It wasn't in anyone's head. No one was aware of it at the time the infringement occurred. And maybe that law firm then puts together a reasonable but wrong theory under which the patent is invalid in light of that prior art. We think that's a case in which the conduct was culpable at the time of infringement, and we think that's a case that would warrant enhanced damages. Roberts. Justice Kagan, did you have a question? Kagan. If you were doing this just on policy, very odd, but, you know, we have a text that everybody's off of at this point, and maybe some view that what happened in 1952 for some of the reasons that Justice Breyer gave is perhaps not the most relevant thing. If you were doing it just on policy, would you come up with this same test? Yes, we would, and the PTO would. We think that the policy concern that Congress had in mind of ensuring deterrence and punishment is — outweighs some of the considerations that have been raised by Justice Breyer and others. As long as we realize that as long as you have a good faith and reasonable defense, that will be a defense to liability. And as long as we realize that you need to have the kind of intentional or reckless conduct, that, you know, it's a very high standard, if you need to have that kind of conduct in order to warrant enhanced damages. Thank you, counsel. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. Before I get into the substance of my argument, one point that seems to me to cry out, at least in response to the characterizations by my friend Mr. Wall, where you repeatedly describe Zimmer's conduct as copying the invention in this case. What the Zimmer Corporation copied was the product itself. The patent wasn't released or issued until two years after that initial copying. There is nothing inherently wrong with finding that a competitor has built a new product, not know anything about the patents or any patentability, no evidence of any patents, and think you're going to copy it and improve on it. I'm sorry? I thought he said the product was marked. And after 2000 it was marked, but the actions taken by Zimmer at the time were in 1998, two years before the patent even issued. I just want to clarify that. I also want to go back to the point that there had been a patent application, though. Right. But there was no evidence whatsoever that Zimmer at that time had any knowledge of anything in the patent. I'm sorry, doesn't the statute exempt out enhanced damages for pending applications? Yes, it does. So why are you here? No, no, no. All I'm suggesting is that it's a mischaracterization of the facts to say that this involves purely copying, beginning from the very outset of the process. That's not to say that there couldn't be an argument somewhere along the line that there might have been an argument of willfulness. But this is not a classic copying case. I mean, in a lot of ways, this case comes down to sort of trolls versus pirates in terms of how you want to analyze it.  And I think that's what the Court of Appeals has just offered you, tells you everything you should know about this. His criticism is that a good lawyer is hired and goes off and searches in the German libraries and finds some basis upon which to challenge legitimately the validity of that patent. Now, if it had turned out that those German sources, they had in fact demonstrated that that patent was invalid, the position of the world would be that's great, because this patent should be declared invalid and the monopoly that attaches to it should be declared null and void and unenforceable. The fact that they found it and it turns out not to get you over the hump shouldn't be by any stretch of the imagination lead to a standard of the law that discourages us from going out and trying to find both the limits of the meets and bounds of the patent itself, as defined by the patent holder, and to challenge the invalidity of those patents under all circumstances. And, Justice Breyer, I mean, that goes to the core point that you were making. We're not talking about a situation here where it's obvious when something is infringed. There are thousands of patents, hundreds of thousands of patents. There are lots of entities creating new products every day, new services, if you want to go beyond the products and the patent law. And my empirical information, I put laugh slightly, is coming out of the briefs, which you do have to admit has an interest. But I've assumed, and is there stuff that I could look at that would back this up, that in a world of patent and copyright protection, I think it's unfortunate that Congress hasn't passed a special regime for those kinds of patents, but they have. In that such — in that a world like that, we're seeing more and more companies that have more and more, and continuously more, patents. And if all that happens is you send a letter to somebody who has something that's trying to break into the industry, and they don't have enough money to hire many lawyers, that becomes a serious barrier, and that the government's rule, in your view, and the opponent's rule, in your view, will raise those barriers to entry. Now, that's a very elementary kind of assumption, and I do admit it, supported by the briefs on your side. And is there anything you would refer me to that would suggest that maybe I have a point, and your briefs have a point? Well, the briefs that I thought were particularly effective, Justice Breyer, are the amicus brief of public knowledge and the — Of course. I've looked through them, and I understand that they're effective. I just feel a little bit more comfortable when I can read something that isn't participating in the litigation, and it, too, bears out this view. Well, Professor Lemley has written on this subject repeatedly, and he has — He's one of the lawyers coming in and inventing various things that make the patent look weak after the event. You see, I mean, he is not totally with you on this. Right. But there are two separate issues here. Let's — and I'll take those in turn. The first one is, is there empirical evidence that there is a significant amount of activity out there in which patents are asserted in more or less specific ways? You'll recall the example given by my friend was, you receive a letter that identifies the precise claims, identifies exactly how you infringe it, and it's ignored. Well, I can assure you, that is not the standard letter, and that's not the kind of letters that are involved in this case. The letter we got said, we have patents, would you like to — would you like to pay a royalty for those patents? It didn't identify the claims. It didn't tell us anything about them. We handed them to an engineer. The engineer looked at them, said it looks the same as the product we're already producing. Put it aside. We went forward with it, and we find out later we can't do it. Breyer. Is there a way of compromising this in this way, to say to the circuit, we see your point, okay, and by and large we accept it, but there can be very big companies that make a habit of getting those letters and giving the things to engineers, as we saw right now in this case, and where something like that goes on normally, then a refusal deliberately to do it for fear it comes back with the wrong answer. Or you do do it and you get the wrong answer and you go ahead anyway. That may be worth willful damages, even though, in fact, there was a slight flaw with this patent. Justice Breyer. What about that? Giving them some leeway around the edges. Justice Breyer, I understand the desire to always be in a position where you can sort of catch that one party that's out there, and I think the real issue there is twofold. One is, is it worth the candle to go, I mean, do you really need to go find that one entity? Breyer. Even the circuit has already decided. Well, have they had that squarely facing them? Were they had, were they, and they did. Did they have that issue?  The plaintiff's version of it, there was a fair amount of information available. And your other point, you were just about to make a second point. Do you remember? You see, for one thing, it was a good point, too. I always appreciate it when you anticipate I'm going to make a good point before I make a good point. Mr. Phillips, I, there's a whole lot of worry articulated by Justice Breyer and reflected in your briefs about protecting innovation. Yes, Your Honor. But there's not a whole lot of worry about protecting the patent owner. I can't forget that historically enhanced damages were automatic. And they were automatic because of a policy judgment that owning a patent entitled you to not have people infringe, willfully or not willfully. And I accept that at some point there was a different judgment made that good faith infringers should be treated differently than other infringers, willful infringers. But I don't know that that's swung things so far the other way that it can only be that if you come up with something, any defense whatsoever in the litigation that's not frivolous, that that gets you out of enhanced damages. Let me just say- If I'm there- I get you. If I'm there- Right. And I don't think that the Seagate test is appropriate, but I am still in the balance of how do we get a similar protection without an artificial test that I don't think is right. Right. Where do I go? Well, let me at least correct one portion of the statement, because you said enough to put forward that it's not frivolous. I don't think that's the appropriate standard. Objective reasonableness is the requirement that the Federal Circuit has looked at, and I think that's more than simply the ability to satisfy Rule 11. I think there has to be a substantial defense, and substantial defenses were put forward in both of these cases. Indeed, these were, in both instances, close cases. So I would hope that that's where the Court would focus its attention. Well, the district court thought differently in the second case. Right. But, again, I think it's important to look at the way the court of appeals analyzed it, and the reality is, I think, and it's the reason why you have to have an experienced and expert court of appeals looking at these issues on an objective, on the basis of an objective analysis, because they're the ones who have seen these kinds of claim construction issues, have seen these kinds of infringement issues, and are in the best position to be able to say, this is objectively reasonable and, therefore, not something on which enhanced damages should be added. What I think it's important to put in context, because you're going through the history of this, is, again, to look at the difference between Section 284 as it evolved and the meaning of Section 285. I mean, this Court last term said Section 285 has now, not essentially or effectively, has completely made the enhanced damages purely punitive, because every other piece of conduct goes into the portion that talks about whether you get the attorney's fees. That's what makes an extraordinary case. Yes, Your Honor, I'm sorry. We are, after all, dealing with statutory language. I'm not sure it's been quoted yet.  And yet, the Federal Circuit standard, you've got heightened burdens of proof, particularly articulated. I mean, the way courts have been used to dealing with discretionary standards for a long time, and the way it works is, historically, you know, the exercise of discretion in a lot of cases, you know, wears a channel which kind of confines the exercise of discretion. And I think the other side's argument is based on that history. Right. Over time, this is what discretion has given us in this area, and therefore, you get beyond that, it's an abuse. But to erect this fairly elaborate standard on the basis of that language, I think, is surprising. I understand that, and that's why I think you have to take it one step at a time. First of all, you quoted one portion of the language of 284. The portion that I focus on particularly is the you begin with damages adequate to compensate for the infringement. So the 284 is now, you know, since 1952 has been focused exclusively on the infringement. It's not any other kind of ancillary conduct. It's only enhanced damages for the infringement, because those are the only, you know, those damages are one and the same. Then you get to the point where Seagate says, if we don't have a strong enough standard of recklessness and willfulness and an objective standard that can be examined by us independently, the downside risks and the harm to the economy is very substantial. There have been — there are huge numbers of these letters being sent, litigation. It skews every aspect of it. And then Congress comes back in the America Invents Act, and through the process leading up to the America Invents Act, Seagate comes into being. And the Federal Circuit takes a very hard look at it. Congress looks at that and says, we're not going to change section 284, because in light of Seagate, that willfulness standard, which is the standard the Court was very explicit about, that helps solve the problem that all of us have been concerned about. But Congress doesn't just leave it at where you have to infer this from silence or inaction by Congress. Congress passes section 298, and in section 298, it talks about opinions of counsel and what role they play in the willfulness determination. It seems to me in order to give section 298 any significant meaning, you have to have concluded, then, that 284 necessarily incorporates a standard of willfulness, even though obviously it's not in the language, but just— Kagan But I don't know how far that gets you, Mr. Phillips, because Mr. Martinez just told us that he'd be happy to call willfulness his test. I mean, willfulness has meant different things to different people here. Phillips Yes. Kagan And there's nothing that Congress did that suggests that when it used that word willfulness, it really meant the Seagate test. Phillips Well, the only test in front of it at the point, at that point in time, was Seagate, because Seagate was the definition of what 284 was about and what the standard of willfulness was about. But I think what's equally important, Justice Kagan, is I'll concede that willfulness can have a lot of different meanings, but the meaning that the Seagate court adopted was the meaning this Court adopted in Safeco. And it's interesting, because my friends have not—didn't say the word Safeco at all in their 25 minutes of presentation, but — and this is why it's not such a big jump, Mr. Chief Justice, because what Seagate said is, what's the best source for trying to come up with a sensible way of applying willfulness? And they looked at Safeco and they said, you know, the best way to do it is with a recklessness standard, that's an objective determination, and the fact that there may be subjective bad intent is off the table. I mean, that's footnote 20 of the Safeco opinion, and the Court said that's the best way to enforce this statute. Ginsburg. Can we at least peel off the clear and convincing evidence that seems to come out of nowhere, and that the standard is de novo review rather than abusive discretion? I would — I would desperately ask you not to take out de novo review, because we're talking about an objective standard. It's really almost — it's essentially a question of law. The issue is, is there an objectively reasonable basis for what's been done here. I don't believe that's a standard that should be deferentially used. Well, the clear and convincing standard, I don't think, is particularly relevant to how this case got decided, because at the end of the day, it's not because it was clear and convincing. At the end of the day, it was because there was objectively reasonable defenses that were put forward in both of these cases. In a proper case, obviously, you'd have to fight that fight. The only thing I can say — well, it's not the only thing. There are two things you can say in defense of clear and convincing. First, it was in existence in 1985. Congress passed the American Invents Act, didn't modify it, and so may have, in that sense, either acquiesced or ratified it under those circumstances. And second, we're talking about punitive damages, and therefore, under normal circumstances, it's certainly not a matter of indifference when you're talking about allowing a plaintiff to go forward and skew completely the entire litigation process as a consequence of having access to troubled damages. In that context, some heightened standard might make sense. In this context, it's hard for me to get excited about one way or the other, because these are not really factual questions. If you were on a subjective intent standard, that would be a different issue. But in the context of objective reasons … Ginsburg. I'm sorry? Ginsburg. You care about de novo review in the Federal Circuit rather than testing the district court's determination for abuse of discretion. Yes, Justice Ginsburg. I think it is critical. There are two elements of this that are absolutely critical, and I suppose in some ways it goes to the question you asked, Justice Sotomayor. What are the absolute critical elements that you need to take out of Seagate to apply in these cases, and candidly, both would lead you to affirm in both instances on the facts of these cases. One, you need to have an objective assessment of whether or not there is a reasonably objective set of circumstances that allow the defendant to say this, either these And, two, you have to have that reviewed non-deferentially by the Federal Circuit in order to ensure that the 500 or 400, I forget how many district court judges there are, do not sort of go off on a tangent, and that we get the consistent review by the objective and expert body that the Federal Circuit is. The recklessness decision here seems different from those that generally come up. And maybe you can provide an example where this occurs outside of this context. Usually, to determine whether someone was reckless, you have to assess the nature of the risk, the severity of the risk. And in the typical tort case, the severity of the risk may seem greater at the time of trial than it did at the time of the tortfeasor's action because someone has been harmed. But in this situation, the degree of the risk seems smaller at the time of the determination of enhanced damages than it may have been at the time of the infringement. And I can't think of another, because it's a legal risk, and the first determination may not have been made with the assistance or a very intense analysis by attorneys, and in the latter time the attorneys are very much involved. So is there any other situation where a recklessness determination has those characteristics? Well, I think the copyright would probably be the other one that sort of attends to it in the same way, because it's essentially the same kind of an inquiry. I mean, part of the problem is it's the nature of the continuing tort action, and it's also the fact that the infringement determination is a matter of strict liability. So, you know, there are a thousand, obviously, different ways of — different You're in a situation where you've come out with a product, you think it's a perfectly good product, you may or may not have been looking at patents, you didn't see anything that creates a problem for it, you put it in the market, two, three years later somebody sends you a letter, and the letter is not very specific. And then so you say, I don't see anything here, I don't envision a problem, you keep going forward. And then you get a very specific letter, and you look at that and you say, well, gee, okay, I see that. I mean, part of the problem with the notion of looking at these things and saying we're not going to have a post hoc analysis is it's almost impossible to define post hoc from when. Breyer. How does it work in tort law? Well, in tort law, I mean, so you can imagine situations where, when the actor takes a risk, it looks tremendously great, but by the time trial's over, it was pretty small. It happened, but, you know, eggshell skull, he thought almost certainly he had one, and he did, but the chances of his having one were a million to one against it. Punitives, how does the reckless, do you have any idea? Well, you take, I mean, obviously you take the plaintiff as you. Yeah, but it turns out as you found him, it wasn't very bad, and what you thought you were going to find him was just terrible. This must come up. Right, but my guess is in those circumstances, Justice Breyer, there aren't punitive damages. There are. There are not. There are not. Because you probably act reasonably honestly. Well, then we would have an analogy on your side. If it goes the other way, it would be an analogy on the other side. Well, my friend, on the other side, come forward with tort cases in which the eggshell plaintiff gets punitive damages because the defendant overreacted. Is there any way to allow some consideration for a subjective intent to infringe in an egregious case as an additional element for, as an additional way to define willfulness without completely wrecking the Seagate standard? I think if you are in a situation where you pass recklessness, that is, there is no defense, there is no objective, this is a true pirate, no objectively reasonable argument. They saw the product, they build it, maybe they don't operate within the United States, they just sell here, they operate outside the United States, think they will never get caught, et cetera. And in those circumstances, they don't have a defense. And then you also can prove that they acted with absolute intent and knowledge of the patent, et cetera. Then the question, would you take that to the max, to three times? Because that's where the discretion line is.  He says, Mr. Jones. Roberts Copy of product or copy of patent? A patented product. All right. So same thing, let's call it. Mr. Jones sells a product that involves a patent and it's selling very well, and Mr. Smith comes along and says, I want to copy that patent and that product and sell the same thing so that I can reap those profits, too, and does that. Now, the Seagate test says that as long as his lawyer can come along at the end and raise some kind of doubt about the patent's validity, the fact that — I forget whether it was Mr. Smith or Mr. Jones, but the fact that — One of them. The fact that he went and said, I am going to copy this patent so that I can reap the benefits of some other person's work, that doesn't make a difference. And that's, I think, the question that Justice Kennedy was asking. It seems to stick in the craw a bit. Right. Well, one answer to Justice Kennedy is there is a role for that kind of subjective bad faith, but it's only after you make the determination that — Right, but that's not enough, because, you know, I'm Mr. Jones and I'm saying, is it worth my while to go copy this patent? And I think, you know what, a lot of patents are not valid. I'll take this risk. I will make a lot of money selling this patented product, and if somebody calls me on it, I'll go hire myself a lawyer, and that lawyer will come up with some kind of argument about why the patent's not valid after all. Now, that seems like the bad — that seems like a bad incentive. Justice Kagan, the two basic points I would make to that. First of all, I don't remember if it's Mr. Jones or Mr. Smith, but the bad actor we'll call — the bad actor in that circumstance obviously has to pay the full compensation for the infringement, which is in some instances tens of millions of dollars, will almost certainly be subject to attorney's fees under Section 285. So it's not as though you're getting a pass under that — in that situation. Now, I understand the desire to have enhanced damages against that particular bad actor. That's why I say, in a lot of ways, this case comes down to what do you worry about more, pirates or trolls? My assessment of this, and I think it's borne out by the way the Federal Circuit has looked at this problem, is that there are not that very — there are not very many pirates out there. And if you keep a rule that is designed simply to get the one in a million pirates — I would call them unicorns, but one in a million pirates — you end up with a rule that will allow the trolls to go after every legitimate producer of products and services in this country. And that's the price you'd have to pay to get at the really bad actor who won't get it. Breyer, I know this is not exactly a question, but we've seen in your brief, what we see countering in your brief, is there was a company, and the company made, I think, cotton goods. And an individual thought that he could make a lot of money by taking those cotton goods that they were used and selling it all over the United States. And so he did it. I think it was Alexander Hamilton. I'm not sure. And as a result, New England grew rich. Now suppose he'd gotten a letter one day that said, we have a patent. We have a patent. And it would have cost him $10 million to look into it, and he didn't have all that money, so he thought he'd run his chances. Now, suddenly, I'm not so sure which way the equities will work out. That's your point. Both of you have a point. And that's what I'm looking for. Is there some way we can get the real worst ones without destroying what you don't want to have destroyed, and yet where he's really worried about the real worst ones? And I think the answer at the end of the day is Congress made the choice, I think. Breyer, they just used the word willful. I'm not. No, no, but it did it against the backdrop of the Seagate standard, because Seagate clearly made a judgment that as between a raft of claims by nonpracticing entities arising out of a raft of letters and everything that goes with that, between that and the risk of a true pirate out there, that Congress, that it thought the better answer clearly was that we should protect and limit the scope of the patents and make sure that they are being properly challenged in a regular basis. Roberts Well, the choice is reflected in the statute, which leaves a lot of discretion to the district courts. And I think a lot of the arguments we've heard today are the sort of arguments that can be made to the district court's discretion in a particular case, saying, you know, this is one of those pirates or, you know, trolls, and it's a serious one or it's a less serious one, and you have these standards to apply, and the district court will exercise the discretion. And if it's out of the channel of discretion, then the court can review it on that basis. Phillips Mr. Chief Justice, I think the problem with that is, is that unless you come up with recklessness or egregiousness, I don't know what egregiousness means, and I don't know how you evaluate that on review. I do know what it means to take an objectively reasonable position. It's more than simply something that's beyond frivolous. It is a substantial argument that either the patent doesn't extend to my particular product or the patent itself is invalid. In circumstances where that is true, my hope would be that the Court, recognizing the extraordinary importance of limiting patents and the monopolies that flow from there, would drive the legal decision in this context or the legal standard in this context exactly where the court adopted it in Seagate. That's the court that has the experience and expertise, and I would hope under these circumstances, in this very unusual situation, because patent law in this context I do think is very different than almost any other tort context, I would hope in the one, in the decidedly one-sided approach that 284 is where it only gives to the plaintiffs the ability to do what they can do and what they want, that the court would adopt the kind of rigorous subjective standard that allows both for the determination that the patent is invalid or doesn't infringe and that that's examined on an objective basis. If there are no further questions, Your Honors, I urge the Court to affirm. Thank you, Mr. Phillips. Mr. Wall, you have four minutes remaining. Mr. Chief Justice, I have two fairly simple points. The first is, as we and the PTO and many of Respondents of NAMIKI recognize, the system as it currently stands is out of balance, and we have tried, and I believe we have succeeded, in crafting an approach that balances the Court's concerns with the need to respect the rights of patentees, including small companies like HALO, and we've done it in a couple of different ways. Reasonable good-faith efforts to challenge patents are not going to result in enhanced damages, and intent and recklessness are not going to be and should not be easy to show. Now, the Federal Circuit hasn't adopted a contrary approach based on its expertise. It thought it had to in light of this Court's decision in SAFCO, which it has misread. SAFCO says if you adopt a reasonable view of the law at the time, you're not acting willfully. It doesn't say if you subjectively and correctly believe that you are violating the law, you are held not to be willful because you have hired a good lawyer and come up with a defense later. And that approach is what has skewed the incentives in the patent system and taken us out of balance. Our approach incentivizes good, commercially reasonable behavior under the full set of circumstances at the discretion of the district court. Their approach is incentivizing good litigation. And the second point I just want to make quickly is we do have the evidentiary burden and the standard of review in this case. I think it's clear that there isn't any basis for the clear and convincing standard. On the standard of review, I think Highmark resolves it and I think Pierce v. Underwood resolves it. These are determinations that are bound up with the facts. And just as the Court said in Pierce, whether a litigating position is substantially justified is a mixed question of fact and law. So, too, the questions here. These should be reviewed for abuse of discretion, and it's very important for the Court to say that. HALO should go back to the district court and be analyzed under the right standard so the evidentiary burden matters. In Stryker, the district court actually got to the discretionary weighing, did it. And on appeals, Zimmer never challenged that as an abuse of discretion. It just argued about the objective prong. When this Court takes that out of the analysis, as it should, there's no basis to disturb the district court's discretionary ruling. And as the Court knows from looking at it, it's a thorough and reasonable opinion. Alito, so. Alito, Mr. Phillips brought up that you didn't address in your initial argument. Maybe you could say a word about it. Is section 298 of the American Invents Act, under your reading, could evidence of the failure to obtain or introduce advice of counsel be used to prove that the defendant infringed in bad faith? No. The patentee cannot put that at issue affirmatively. All 298 does is it dealt with that very narrow problem. And when the patentee comes in and wants to show intent or recklessness, it can point to your copying of the patent. It can point to the fact that it gave you really extensive, very detailed notice. It tried to license with you. You didn't do anything. It cannot put at issue whether you talked to counsel. Now, the defendant may decide. Alito, how did you get to that point under the language of 298? Because 298 just says when you're proving up willfulness, whether it's a factor as it is in our approach, whether it's the end-all, be-all as it is on their approach, whenever the patentee is trying to prove that up, you can't affirmatively put that at issue. And as Pulse candidly and I think honestly concedes in its brief, you can read 298 to have effect on either side's view of how you ought to treat the enhancement statute. So I don't think 298 cuts either way. And I would just stress for the Court that Congress at the time looked at putting willfully in the statute, and it looked at putting something virtually identical to Seagate in the statute. It didn't do either one. So I don't think it can be taken to have ratified the Federal Circuit's current approach. Thank you, counsel. The case is submitted. Thank you.